NOT DESIGNATED FOR PUBLICATION

No. 117,650

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STORMONT-VAIL HEALTHCARE, INC.
and STORMONT-VAIL, INC.,
*Appellants*,

v.

THE BOARD OF COUNTY COMMISSIONERS for JACKSON COUNTY, KANSAS,
*Appellee*,

v.

COREY MELLENBRUCH,
*Third-party Defendant*.

MEMORANDUM OPINION

Appeal from Jackson District Court; JEFFREY R. ELDER, judge. Opinion filed May 11, 2018. Reversed and remanded with directions.

*Jennifer Martin Smith* and *E. Lou Bjorgaard Probasco*, of Probasco & Associates, PA, of Topeka, for appellants.

*David R. Cooper* and *Seth A. Lowry*, of Fisher, Patterson, Sayler & Smith, LLP, of Topeka, for appellee.

Before LEBEN, P.J., GARDNER, J., and BURGESS, S.J.

LEBEN, J.: At about 2 a.m. on a Saturday morning in 2012, Jackson County Sheriff's Deputy Shawn Swisher saw a car run through a stop sign in the small town of Netawaka. Swisher turned on his flashing lights and stopped the car.

But after a short time—and before Swisher even got out of his patrol car—the other driver sped off. Swisher pursued—across a field, onto a county road, and across a highway. Speeds topped 70 miles per hour on the county road, and the fleeing driver's car eventually crashed and landed on its top.

When Swisher approached the car, a woman who had been a passenger told him that the driver had run off. Swisher spotted the man running through a field. Swisher pursued on foot, going over barbed-wire fences and into another field, identifying himself as a law-enforcement officer and yelling for the man to stop.

Ultimately, the man stopped, turned around to face the officer, and raised his arms in surrender.

Swisher then ordered the man to come forward to the officer; the man refused. Swisher then ordered the man to walk over to the edge of the field so that emergency-medical personnel could look at him. He again refused, saying he thought he'd broken his ankle.

Swisher then came to the man and asked for identification. Swisher actually took the man's wallet from his back pocket. He then learned that the man was Corey Mellenbruch. Swisher was then able to learn from his dispatcher that Mellenbruch's driver's license was suspended. Swisher also learned—by asking Mellenbruch—that Mellenbruch was on probation for some past offense. And Swisher heard Mellenbruch tell medical personnel that he had been drinking alcoholic beverages that night.

The medical personnel concluded that Mellenbruch needed medical attention, and after Mellenbruch was put on a backboard, Swisher helped carry him to an ambulance. The ambulance took Mellenbruch to Stormont-Vail Hospital in Topeka, and the Jackson

County Sheriff's Office arranged for a blood sample to be taken to see whether Mellenbruch had been driving while intoxicated.

Swisher didn't go with Mellenbruch to the hospital, and Mellenbruch was not taken into custody on his hospital release. The State charged him with several offenses, including three felonies that he eventually pleaded guilty to: aggravated battery, interference with a law-enforcement officer, and fleeing from or attempting to elude a law-enforcement officer.

But the case before us doesn't involve Mellenbruch's criminal responsibility for those offenses. We're called on to adjudicate a dispute about whether the taxpayers of Jackson County are responsible for Mellenbruch's medical bills. After the hospital found that Mellenbruch was neither insured nor eligible for Medicare or Medicaid, it sought reimbursement from Jackson County under a Kansas statute, K.S.A. 2012 Supp. 22-4612(a), that makes a county or its law-enforcement agency "liable to pay a health care provider for health care services rendered to persons in custody of such agencies."

In interpreting that statute, the Kansas Supreme Court has held that a governmental entity's duty to pay the health-care expenses "is triggered by the entity having custody of the indigent offender *at the time the decision is made to obtain medical treatment. . . .*" (Emphasis added.) *University of Kan. Hosp. Auth. v. Board of Comm'rs of Unified Gov't*, 301 Kan. 993, 1006, 348 P.3d 602 (2015). So Jackson County is liable for the expenses if Mellenbruch was in Deputy Swisher's custody when the decision was made to send him to the hospital for treatment.

You might think the answer to that question is pretty clear here. Swisher chased Mellenbruch at high speed across fields and down a county road; Swisher then chased Mellenbruch on foot over barbed-wire fences, identified himself as a law-enforcement officer, and ordered Mellenbruch to stop. And eventually Mellenbruch *did* stop—and

3

surrender. And Swisher then took the man's wallet and had it in his possession when he decided to send the man to the hospital. You certainly wouldn't expect an officer just to let someone go who had—in front of the officer's own eyes—committed such serious felonies as aggravated battery, interference with a law-enforcement officer, and fleeing from or attempting to elude a law-enforcement officer.

But Jackson County says Mellenbruch wasn't in custody, so it isn't responsible for the hospital bills. The district court agreed, and the case is now before us on the hospital's appeal. The parties agree that no facts are disputed, so we review the legal issue independently, without any required deference to the district court. *Martin v. Naik*, 297 Kan. 241, 246, 300 P.3d 625 (2013).

The County contends that Swisher never formally arrested Mellenbruch, put him in handcuffs, or go with him to the hospital. While the deputy *could* have arrested Mellenbruch, the County argues, he didn't do so.

Given the facts of this case, we think the County cuts too fine a point here. The officer saw Mellenbruch commit three felonies in the officer's presence. And a statute *requires* an officer to take into custody a person stopped for one of those offenses— fleeing from or attempting to elude a police officer. See K.S.A. 8-2104(a)(2). Consistent with that statute, the officer chased Mellenbruch down, told him to stop, saw him raise his hands in surrender, took his billfold and ID, and called in medical personnel to examine Mellenbruch.

As a factual matter, Swisher had custody of Mellenbruch at that point. Swisher decided where and when Mellenbruch could move, whether medical personnel could approach him, and whether medical personnel could take Mellenbruch to the hospital.

4

In response, the County raises a legal objection. The County cites caselaw that determines when an officer can detain someone temporarily without violating Fourth Amendment prohibitions on illegal search and seizure. When analyzing a situation to determine whether the Fourth Amendment has been violated, courts recognize a stop short of full custody called an investigatory detention. That's what lets an officer stop a moving car and its occupants for a reasonable time based on reasonable suspicion that some crime has been—or is about to be—committed. See *Terry v. Ohio*, 392 U.S. 1, 22, 26, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968); *State v. Hanke*, 307 Kan. ___, Syl. ¶ 2, ___ P.3d ___, 2018 WL 1886010 (No. 114,143, filed April 20, 2018). Without reasonable suspicion or when longer than necessary, such a stop violates the Fourth Amendment. With reasonable suspicion and for only the time that's needed to investigate the situation, it's a lawful investigatory detention.

The County urges that we consider Mellenbruch to have been momentarily detained merely for investigation, not taken into custody. But there are two problems with that. First, as a legal matter, we're determining whether Mellenbruch was in custody under a Kansas statute allocating responsibility for medical bills, not whether his detention complied with Fourth Amendment standards. Second, as a factual matter, there was nothing Deputy Swisher needed to investigate to decide whether to take Mellenbruch into custody. Swisher saw Mellenbruch commit at least three felonies in the officer's presence, and a Kansas statute, K.S.A. 8-2104(a)(2), required that the officer take Mellenbruch into custody for one of those offenses.

The County also argues that Swisher never formally arrested Mellenbruch, citing the definition of arrest from another Kansas statute, K.S.A. 22-2202(4). It provides that an arrest is "the taking of a person into custody in order that the person may be forthcoming to answer for the commission of a crime." The County emphasizes that the officer didn't handcuff Mellenbruch, didn't accompany him to the hospital, and didn't

5

place any formal hold on him so that he could only be released from the hospital in custody.

But our Supreme Court has also said that "arrest might not always be necessary to establish custody." *University of Kan. Hosp. Auth.*, 301 Kan. 993, Syl. ¶ 3. The court made that conclusion even after noting another statutory definition, in K.S.A. 22-2202(9), that generally defines "custody" as "the restraint of a person pursuant to an arrest or the order of a court or magistrate." It's not at all clear that the Legislature had that definition in mind when it wrote the separate statute at issue in this case about responsibility for medical expenses.

We need not determine in this case whether, when Swisher finally caught Mellenbruch in a field, Mellenbruch was placed under formal arrest. On the facts we've set out in this opinion—involving a lengthy chase, an officer's personal observation of a felony that required placing the offender in custody, and the offender's surrender to the officer's authority—we believe Mellenbruch was at least in custody.

Custody is what's required to trigger the responsibility for medical expenses under K.S.A. 22-4612(a). Since Mellenbruch was in custody when the decision was made to send him to the hospital for treatment, the county has responsibility for uncovered medical expenses. Even if Swisher wanted to release Mellenbruch from custody to avoid that result, the Legislature separately provided that an officer cannot release a person from custody merely to avoid responsibility for the medical expenses to come. See K.S.A. 22-4613(a). So Jackson County was responsible under Kansas law for the costs of medical treatment. Summary judgment should have been entered in favor of Stormont-Vail Healthcare.

We close by noting that the underlying issue in this case raised a policy question: whether the cost of treating Mellenbruch should be borne by the hospital or by the

taxpayers of the governmental entity that had taken Mellenbruch into custody. The Kansas Legislature has determined that this cost should be borne by taxpayers—limited to reimbursement at no more than the Medicaid reimbursement rate under K.S.A. 22-4612(a)—rather than by the hospital in cases in which the person in custody is indigent and uninsured. Today's decision simply carries out that legislative direction.

The district court's judgment is reversed; the case is remanded to the district court for further proceedings consistent with this opinion.